The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. All right, we'll hear argument in our next case, United States v. Arce. Mr. Thuer. Thank you, Your Honor. May it please the Court, my name is Jim Thuer, I'm the counsel for the appellant, Mr. Arce. This matter comes before the Court from the verdict after a bench trial, finding my client guilty of counts of receipt and one count of possession of child pornography. The issues on this appeal are laid out in the briefs, and I just want to touch on what I think are the highlights and answer the Court's questions as I do so. The first issue is related to custodial interrogation of my client that was used at trial. It was the subject of a motion to press that was denied. And we briefed this issue, the government and I, and we have addressed in many respects the same cases. We rely on Hashimi and Kalana, government relies on Hargrove, but I think it's important to look at the similarities between the two and what Hargrove distinguished. Hargrove distinguished the fact that in that case, the defendant was not under constant armed guard and escort, and the interrogation did not occur in a law enforcement vehicle. Well, here, it's undisputed that the interrogation did occur in a law enforcement vehicle, and Mr. Arce was, in fact, under constant armed guard and escort for approximately two hours, the duration of that encounter. He was requested to go to the vehicle. The woman who was there with him in the house, she was ordered not to speak. They were ordered not to speak to each other. And there was a flood of officers into the house. It was 14 officers from three different agencies, as well as additional uniformed officers outside. So we think that our fact pattern is much more similar to Hashimi and Kalana than it is to Hargrove. Well, in cases like this where there were post-warning, warnings were given after statements were made, was there any evidence presented of coercion? Our evidence of coercion, Your Honor, is the fact that it was in the law enforcement vehicle. Those warnings, the Miranda warning was given 25 minutes after the interrogation started in the vehicle in which Mr. Arce was in the front seat with one officer in the driver's seat and one officer immediately behind him. We think that is the custodial nature, the coercive nature of the interrogation, in that he was asked to go to the vehicle away from the kitchen where Ms. Farmer was. Again, that's an interesting, that's an important fact when you look at Hargrove's facts. And within that context of that interrogation, that's when the Miranda warning was given after the incrementing statements had been made. Well, can we find that in circumstances like this that the officers mistakenly failed to do it, they didn't do it purposefully, can we make such a finding? I believe it's fair to say that the evidence would be that they didn't purposefully not give him the Miranda warning before they took him to the vehicle. But that is not dispositive. When you look at the Kalana case, there were, in fact, warnings given, and yet this court found that the interrogation was custodial, coercive, and therefore the warnings didn't cure the coercive nature of the interrogation, similarly in Hashimi. So I understand the court's point, but I think that the case law that the Fourth Circuit has developed over time is that even if you have prophylactic warnings at some point, those alone do not cure whether the statement was knowing and voluntary if it was equally accompanied by or overwhelmed by factors that showed coercion. Can you go back to the sort of maybe the question that comes first that I struggle with a little bit, which is, this isn't his home, right? And so we've sometimes talked about in the car cases, for example, that the driver of the vehicle sort of has some feeling that he has to stay with the vehicle. And you might say the same thing about the resident of a home. Like if they go to your home, you may feel less freedom to leave. But where he's invited, and this is not a standing question, but just from a freedom to leave perspective, doesn't it seem to matter that this isn't his home, and that the officers, at least when they showed up, had no reason to think that he was involved in the criminal activity, he would not have, at least an innocent person in his shoes would not have believed that they were there to get him? All of those things seem to me to suggest, unlike the cases that you cite, which are all about going to the defendant's home that everybody knew was the target of the investigation, he's not the target of the investigation. This isn't his home. You know, he asked somewhere else to go, right? Unlike if it was his own home, don't all those cut against the idea that he was in custody? Your Honor, I would disagree that they cut against it for this reason, that he is house sitting for his sister and brother-in-law, and he is in charge of their dogs. So he has responsibilities to not only the property, but to the animals in the house. So it's not a question of him simply abandoning the animals. All right, totally fair. But the question of whether he's in custody is whether law enforcement creates a need to stay, right? Not whether his love of his canine friends creates an obligation to stay, right? But Your Honor, the facts here, I think, are clear that it's the agent's own testimony that they asked him to go to the car. They asked him to go to the law enforcement vehicle. They didn't say to him, he didn't volunteer to go to the law enforcement vehicle. They didn't cuff him and drag him there either, though, right? Correct. But those are all different from the question I'm asking, right? Maybe you say it's not enough, but you say it doesn't weigh at all the other way that this isn't his house, that, you know, he's not the driver of the vehicle is the sort of analogy that I'm looking at. You think that doesn't cut against the idea that this was a custodial situation? I think it's a factor, Your Honor, but that's what the court looks at. It looks at the factors. Okay, and so what I'm asking, do you have any cases that address that factor? That's what I'm looking at. I think it's a factor, too. I'm glad you acknowledged that. But what I'm trying to get at is when I look at our cases, I don't see a lot of development of that factor and its relevance to determining the custody question.  Thank you. To continue into the search of the Carribe place where the Alcatel phone and the ZTE phone were located, I would simply point out that in the cases cited by the government in their brief, you did not have this fact pattern where you had a custodial interrogation and it was a continuous process from the interrogation to the search of the location of the apartment. You gave consent to go there, correct? You even showed them how to get there. Absolutely, Your Honor. I agree. And so the issue that we've raised for the court is, is that consent coerced? In other words, is it part of a continuous process? And I recognize that I'm asking the court to find that if it's not coercive in the vehicle at Lord George, I'm going to have a very difficult time convincing you it's coercive in the parking lot of Carribe Place. I recognize that my argument depends on a continuous movement, a continuous custodial interrogation that began when they took him to the SUV in the driveway of Lord George and it continued thereafter through into Carribe Place. There's no other evidence other than this continuum concept that there was conversion at his apartment. The only other factor that I would point out for the court is the issue of the threat of a search warrant and the threat of harassing his brother, who's in the Navy, who was down in Florida. And I would simply point out that those two are factors. Is that the brother who owned the house? Yes. Yes, Your Honor. His brother-in-law. His brother-in-law and sister, that was their house. And I would note that Hummer, which is a case cited by the government, talks about how those two are factors that this court should consider in determining whether consent was voluntary to excuse the warrant requirement or... Did the district court find that there was a threat of a search warrant? Well, frankly, Your Honor, I don't remember the court relied upon that. What the agents did testify was that they did say that they would simply get a search warrant if he did not consent. So that was undisputed evidence at this suppression hearing. Of course, he could have told them to get the warrant. I'm sorry, Your Honor, I didn't hear you. He could have told them to get the warrant.  He could have told them to get the warrant. But again, the Hummer case shows that that is a factor for the court to consider as to whether the consent was, in fact, knowing and voluntary. It's not dispositive. It's simply another factor. And we think that the overall circumstances, with totality of the circumstances test, when you look at the continuous, the fact that it's a two-hour continuous interrogation, two hours in custody, there's no break, there's not the vehicle, then he's back in the kitchen and he's talking to his friend, Ms. Farmer. Agents are doing whatever it is they want to do. Farmer and R.C. are doing whatever they want to do. And then they say, oh, by the way, why don't you let us go to a Cribe place and consent to a search? We don't have that. We have, let's go to the car, interrogation in the car, let's go to Cribe place from the car. And we think that's a factor that's important. I've also raised a number of issues on evidence that was allowed into the trial of the matter, and I want to point them out very briefly. First of all, we made an argument in our brief that the expert report, Exhibit 26 and Exhibit 6, which is the summary of that report, is testimonial. Why? Because the agent, Montoya, testified that he ran a Celebrite software against it to create the report, and then he ran it through a Grify software that would characterize the images. And when, and on direct, he was asked about that, whether he created the report using Celebrite and Grify, categorizing different things you found, and he answered yes, and that's at 612 in the record. That's testimonial. Grify is testimonial. It's characterizing files as either child abuse material or child erotica. And the government makes no argument against that issue. They don't argue about the testimonial side of it. They simply focus on the Rule 52 issue. On the Rule 52 issue, you have the same issue there in that expert reports are hearsay. They are not admitted into evidence. You cannot have an expert get up there, testify to whatever his or her opinion is, and then introduce his or her expert report into evidence for the trier of fact. It's hearsay. There was no stipulation to permit it, and the court erred in allowing that in. On the lay opinion. Before you get off that, so I presume what you're saying here is that the characterizations is what's hearsay, not the Celebrite dump itself is the actual evidence, right? But the characterization as being CP is the hearsay piece or confrontation clause problem. Correct, Your Honor. Okay. So tell me why that's not harmless, right? That characterization, you know, the judge had them, was able to view the images. These were not images that were like close calls one way or the other. And so in that scenario, why is that characterization, if we assumed it was improper, why is it not completely harmless given that the judge was able to view the CP itself? Well, here, Your Honor, the government doesn't even make any attempt to prove that the confrontation clause violation, beyond a reasonable doubt, did not contribute to the verdict. I mean, that's the standard. No, no, but they do, right? Maybe I read it wrong, but I read them to say that because the images themselves were seen by the district court, the trier of fact, that the district court could conclude that they were CP merely by looking at them. It did not require expert opinion, and Griff and I's match was unnecessary, and therefore, its inclusion was harmless. But the issue, Your Honor, is those images don't go to the trier of fact, except that Griff and I characterized them as child pornography. No, but they come on the cellbrite. The whole cellbrite went on. Exhibit 26 is the whole cellbrite. Your Honor, there were 14,000 images on that cellbrite report. In other words, you take the cellbrite, as you characterize it, is the data dump, and it simply dumps every file into a chart. The characterization by Griff and I pulls out. Right, but that doesn't change the calculus here, right? Because if the agent did it behind the scenes and said, here's the dump of 14,000, right, I pick out these five because these are the ones that match Griff and I. And then I put them into evidence, but I make no characterization of them as an agent, none. I just put them down and say, these came off that phone. And that's not hearsay. That's just evidence. Then the judge looks at those and says, that's CP. The trier of fact says, that's CP. I can look at it. Why isn't that the harmless error chain that we're describing? Your Honor, because the government has to prove beyond a reasonable doubt it didn't affect the decision. And what you've described there, Griff I has characterized it. Griff I has testified it's child pornography. That would be the same as if an expert went on the stand and simply – an expert didn't go on the stand. An expert report was simply submitted. Here it is. Here's the child pornography trier of fact. Now you can look at it. I see that my time is up, Your Honor. Can you just answer that question, right? So why isn't that okay? It doesn't work for a drug chemist, right, because the judge presumably can't test the substance on the bench. The trier of fact can't test the drugs. But child porn is not like drugs, right? So child porn, we can look at it, at least in the most extreme examples, which is what we've got here. We can look at it and we see what it is. We don't need expert testimony to tell us that that is a child. Well, Your Honor, I will say this. On the four image files, the thumbnails that supported the receipt counts versus the video file, I think it's a leap to say on the video file that it is patently obvious without the use of expert testimony that every image is child pornography. Without getting into the details of those video files. But that's your point is, is that no, without the expert testimony, it is not beyond a reasonable doubt that somebody would necessarily conclude that these are CP. And if I disagree with you on that, then you lose on harmless error. Yeah, that's right, Your Honor. I just want to make sure I understand the framework. Thank you. You don't have to answer this right now, but I'd like when you get back up for you to focus on the lifetime ban on accessing the Internet. Thank you, Your Honor, I will. All right. Thank you very much, Mr. Stewart. You have some rebuttal time. Mr. Sheehan. Good afternoon, Your Honors. May it please the Court, my name is Daniel Sheehan and I represent the United States in this case. This court should affirm the district court's convictions and sentence of Mr. Arce for receiving and possessing child pornography. There's obviously five issues. In this case, I'm going to start first with the first issue that Mr. Thor addressed and the district court's denial of Mr. Arce's motion to suppress. There was no violation of the Fifth Amendment in connection with the interview of Mr. Arce by the law enforcement officers. And looking at the totality of the circumstances in this case, it is clear that this case is much more akin to the facts presented in the Hargrove case and is really worlds apart from the circumstances presented in Hashimi and the Kalana case. And Judge Richardson, you made a very good point that we would emphasize as well that it does matter that this house did not belong to Mr. Arce. The court has to look at it from the perspective of an innocent, reasonable person. An innocent, reasonable person who's confronted with law enforcement officers and is told they have a search warrant to search that house, that's not his house. So that does and should factor into the court's analysis and determine whether there was a custodial interrogation. Mr. Hicks, am I remembering correctly, in Hashimi and the other case you cited, the officers came in with their weapons drawn? Absolutely. A large team of agents came in with their weapons drawn and essentially pulled those defendants out of bed and ordered them downstairs at gunpoint. In this case, we know it's undisputed. There weren't any guns drawn at any point. Mr. Arce was never handcuffed at any point. It was two plainclothes officers who had on bulletproof vests who came to the door. They didn't barge in. They didn't knock it down. They just knocked on it, and it was Mr. Arce who came to the door. The dogs were going crazy in the background, so he asked if he could go let them out. And the agent said, sure, go ahead. So he did that, and then he came back. And then they found out another woman was in the house, his friend, Ms. Farmer, and she was upstairs. They didn't run upstairs and pull her out and put her outside. They just called for her to come down, and she did. And they proceeded to explain to her that they were there to execute a search warrant on the house and explained to them that they weren't suspects in the case, but they did need to search the premises. And from there, they asked Mr. Arce, for his own individual privacy's sake, if he would go speak to them in private outside in an unmarked police car. So that's why they left the house, to speak with him and have a private conversation. It's important to also consider the fact that once Mr. Arce entered the car, he wasn't put in the back like a suspect would be. He actually sat in the front, right next to Detective Simpson, who was questioning him. And the other agent sat in the back and wrote notes on what Mr. Arce was saying. He wasn't handcuffed at that time. The doors weren't locked. It wasn't a special vehicle that prevented somebody from exiting. And most importantly, at the beginning of that interview in the car, they emphasized to him that he wasn't under arrest, he didn't have to answer their questions, and he was free to leave. And the entire encounter from both pre-Miranda and post-Miranda in that vehicle was at most one hour. In the Kalana case, it was three hours. So this case is just far apart from the circumstances that were present in Kalana. And to move on to the issue of consent, I mean, there's no question that the district court got it right that Mr. Arce's consent was knowing and voluntary. The district court had the opportunity to see Mr. Arce testify at the motion to suppress hearing and made the conclusion that he was educated and intelligent. He was 29 years old. Judge Richardson, to answer your question earlier, the district court did note in its opinion that the officers explained to Mr. Arce that he had the option of either consenting to the search or that they would go and apply for a search warrant, but the district court did drop a footnote inside of this court's precedent which explains that factor is not dispositive. The fact that a search warrant or the possibility of a search warrant is mentioned doesn't invalidate the consent, and that's certainly the case here. Mr. Arce also memorialized his consent in writing. Before they went in to search the apartment, he signed a written consent form. After they went in, one of the agents initially found the ZTE phone, and it was Mr. Arce who actually said, no, actually there was another phone. The phone I told you about earlier was the Alcatel phone. That was under my bed mattress. So then the agent went and got that and brought it out. And after they left the apartment, Mr. Arce signed the consent form, affirming again that he consented to them being able to search the Alcatel phone and the ZTE phone. Not only did he do that, he provided the swipe pattern so the agents could get in without any problem. There was no evidence of any physical or economic threats by the agents to Mr. Arce at all. So the district court got it right with respect to both the Fourth Amendment and the Fifth Amendment. To move on to the district court's evidentiary rulings, Judge Richardson, again, I think you touched on a point that the government has made in its brief. The first is that the categorizations by Montoya, they didn't violate the confrontation clause. They didn't violate the hearsay rule because Montoya himself testified that, irrespective of Griffi, he analyzed all those images and made the call that they constituted child pornography. But he did so based on his training and experience, right? He did. That's correct. And that's expert testimony, and you didn't offer him as an expert. As soon as you say, I mean, you absolutely could have offered him as an expert, right? And he could say, based on my training and experience, that's a kid, right? The problem is, like, that's not what happened, right? So he testified based on my training and experience, which is expert, like, red flag, this is expert testimony, and then put in a report based on Griff and I without, you know, being qualified to talk about whether Griff and I was reliable or not or where it came from or why he relied on it, which he could only do if he was an expert. I'm having trouble understanding your argument. I get the harmless error argument. But I'm having trouble understanding the argument that it's not confrontation clause, hearsay problem, to put in the Griff and I identification as part of his, you know, Exhibit 26. Well, Exhibit 26 was just a cell-write report, which is essentially just a dump of all the information that's on the cell phone. Except, except what? Except it included an identification, a characterization of certain images as being CP. That's not cell-write, right? That's Griff and I. And what's Griff and I? Griff and I is like a law enforcement database where, like, people have determined, based on their training and experience, that these are child porn based on hash values. Viewing them, comparing hash values, all that's legitimate, right? But that's the judgment that's being made here. And you put that in. I don't mean you personally, but you put that in without an expert, and it is the conclusion that it's not cell-write itself, but is instead that characterization that's the problem. Two points on that. The first is that Montoya himself did make the characterizations. The record is clear that irrespective of Griff I, he reviewed those images and made the call that they constituted child pornography. The second point I'd like to make on that is under this court's precedent in the Smith case, it says if a witness could be introduced under 701 as a lay opinion witness or could be qualified and introduced as an expert witness under 702, it's essentially harmless error. We took the position at the trial court that Mr. Montoya's testimony did not rise to the level of expert testimony, but we did disclose him to Mr. Thurr in advance of the trial, and he was aware of him, and the record reflects sufficient qualifications. If the court wanted to qualify him as an expert under 702, certainly there was information that the court could rely on to reach that conclusion. The government does that, right? The government moves to qualify somebody as an expert. We did not believe at the trial court level that that was necessary, but at this level the court can look at it from a harmless error perspective and say his testimony, if it wasn't good under 701, it was at least good under 702 because the record establishes all of his qualifications to do that. And then on top of that, related to our harmless error argument, as you got to earlier, essentially it's the district court's call to make as the trier of facts. So irrespective of what Montoya testified about, it was ultimately the district court's call to determine that those images that were at issue in the indictment constituted child pornography, and that wasn't really at issue or disputed at all. So it is harmless error if there's any error at all. With respect to the sufficiency of the evidence, we made the argument that Mr. Arce has either waived or forfeited his challenge to that such that this court's review should just be limited to determining whether there was a miscarriage of justice. But even if the court looks at it from a de novo review perspective, it's not even a close call. There was abundant amount of evidence pointing to Mr. Arce's guilt in supporting the convictions of him for both receipt and possession. The first, of course, was Mr. Arce's confession, that he indeed downloaded and looked at child pornography on the Internet using a specific file-sharing application called the uTorrent application. He told the agents that he was familiar with very specific search terms that are associated with child pornography. He'd been looking at child pornography over the last one to two years and actually had most recently looked at it in the past two to three days. And that information is important because it was corroborated by the government's forensic examination of the cell phone, which showed, number one, he had the uTorrent application on there. Number two, he had looked at and received images in May of 2018, which was the same time frame that the search warrant was executed. He told the officers that he'd been looking at the child pornography in the last two to three days. And, of course, it wasn't just the images that were named in the indictment. It was 347 images in total and three videos that constituted child pornography, as well as the Web history that came up from the Alcatel cell phone, which matched some of the search terms that he told the officers that he was typing in when he was looking for child pornography in the first place. On top of that, you also had the forensic examination of the two other electronic devices. There was the ZTE cell phone. Maybe you want to turn to the supervised release issue. Okay. Yes, Your Honor. Why do we think, admittedly, our case law has recently been evolving here, but why should I find that the district court did enough, given our recent case law on the lifetime Internet ban, to take what I think is your hardest case? Maybe the district court could do enough, but why do we think, with the benefit of hindsight, the district court did enough, given our recent case law on that issue? Or is that something that you acknowledge sort of needs to go back? We don't acknowledge it needs to go back, Your Honor. We think that under the three-prong test that this court set forth in Hamilton, the district court's analysis is sufficient. The first factor the court has to look at is whether the defendant used the Internet to commit the offense. Obviously, that's the case here because Mr. Arce downloaded uTorrent and used the Internet to look at child pornography on his cell phone. So that first factor is satisfied. The second factor that Hamilton emphasized – The two of the supervised release provisions under special conditions 7 and 15, I don't believe the district court gave any justification for. The district court, Your Honor, did give a specific justification related to the restrictions upon access to the Internet and access to minors and specifically said that those conditions were because of the offenses of conviction. And a lot goes into that term, the offenses of conviction, because prior to getting to that point, the district court went into an extensive analysis of the offenses of conviction and what the nature and circumstances of Mr. Arce's offenses entailed. She also said it was because of the lies that were told to Detective Simpson, those that were told to the California police officer, those lies that were told to this court, your admission to sexual abuse running in your family, and then the possible sexual assault that was committed upon you by your brother as a child. And I want to emphasize the lies that she said were told to Detective Simpson, the California police officer in the court, because that goes back to the three factors in Hamilton. Hamilton said that the court has to look at the particular and identifiable characteristics of the defendant that would particularly suggest a restriction is warranted. And in that case, the court said, willful disobedience of court orders and – I'm paraphrasing – but disrespect for the law in the past can be a reason for a district court to say, hey, I can't give you a more narrowly tailored ban in this case. But there was such an extensive record of this. You're given a pretty good reason for some of these special conditions, but it seems like to me it's a lot more detailed than the district court gave. For instance, Special Condition 9, the defendant shall have no contact with minors unless supervised by a competent, informed adult. So, for instance, could Mr. Arce upon release get a job, say, at McDonald's? Because there would be minors coming up to the counter to order. He would have to get permission from his probation officer, Your Honor, in order to do that. But then there's good reason for that restriction based on the record. Not only did he download child pornography and looked at it, he masturbated to it. And the district court put that into the record in supporting the sentence that she gave to him. So that, in the government's view, would be sufficient to justify. A lot of these cases, they have evidence that comes in where an expert comes in. And granted, the court may have gone a little overboard in some of the requirements we've placed on the district courts, but that's what they are today. They've had expert evidence that comes in and says, well, because of his use of the Internet, here are the reasons that this person's characteristics mean he shouldn't have any contact with the Internet at all, or his contact should be limited to this, this, and this. I don't think we have any of that in this case. That's correct, Your Honor. We don't have that in the record, but our view of the case is that there's no bright line rule that an expert is required to testify to support these types of conditions in every case. And it wasn't necessary in this case. The key question the court has to look at is whether the district court made a particular individualized assessment of the particular defendant. And we believe that the district judge in this case complied with that obligation by mentioning all the things that I previously emphasized to you in terms of Mr. Arce's personal history and characteristics and the nature of circumstances of his offense. And more narrowly tailored restrictions were not appropriate in this case because there was just such a strong record of him blowing off the wall. When he was told to turn himself in, he fled to California. When he was approached in California, he was not truthful about his name, his Social Security number. He denied that there was an arrest warrant against him. And then he got up before the district court and she said at sentencing that she had never seen anything like it before in her career, and he lied. He provided, you know, untruthful testimony about the encounter. Does that tie into the special condition that says that he cannot possess any pornographic material, regardless of whether it relates to adults or juveniles? I thought in Ellis that the court went into some detail on that issue. It ties into the special conditions to the extent that we're making the argument that a more narrowly tailored ban would not be suitable in this case. Ellis can be distinguished on its facts because the court emphasized in Ellis that that defendant was not before the court for sexual abuse of a child or for a child pornography offense. He was actually there on a supervisor lease violation based on his failure to comply with GPS monitoring and his previous dishonesty with a probation officer. And there was no evidence in that case or the Roblewski case that computers or the Internet played any role in his offenses. I'd also note that in the Roblewski case, the court emphasized that the district court gave an inadequate explanation and just said these are the standard conditions, these are reasonable and appropriate under the circumstances. And the district court did not do that in this case. Even perhaps without the benefit of some of these cases, she laid out the reasons why she was imposing these special conditions. The district court has broad discretion to fashion the special conditions, and we believe that the district court did not abuse its discretion here in this case. If there aren't any other further questions about supervised release, just to touch briefly on restitution since I have about two minutes left, the district court also acted well within its discretion in awarding restitution to Violet. The district court followed the requirements of Paroline in 2259 by first looking at the general losses that were established by the two experts who evaluated the minor victim, Violet, and determined what her future medical and counseling costs would be based on their assessment of her and based on their experience and training in the field. The district court looked at that and then went through some of the Paroline factors to determine what the appropriate amount would be for Mr. Arcee in terms of what he contributed to in establishing Violet's losses. So the district court looked at the number of past defendants who had been subject to restitution orders for Violet. The district court considered the fact that Mr. Arcee wasn't involved in the production or distribution of the images of Violet. And perhaps most importantly, the district court specifically looked at the nature of these images. They were horrific, sadistic, masochistic. She was 48 years old at the time, and the district court considered that in determining that $5,000 was an appropriate award of restitution in this case. The defense complains that the district court didn't properly consider two other factors, but this court's precedent in Dillard and Paroline made clear that the factors are just that. They're factors. They're rough guideposts. There's not a right-line rule that the district court must consider or has to consider all of these things, and the district court certainly acted within its discretion in this case. What happens in the next case, or a case soon to come, where here the established amount of future compensation is not that much greater now than the amount that has been awarded over time? So in the coming case where you reach that point, does that defendant not have a restitution obligation? We don't believe so, Your Honor. The 2259 is pretty broad in terms of the restitutionary purpose. We made the point in our sentencing position paper that, unfortunately, in the vast majority of these cases, these victims are never made whole because the defendants are never able to meet their full restitution obligation. So just because Violet might have a restitution award of $700,000 doesn't mean that all these defendants, including Mr. Arce, are ultimately going to make good on it. So that should factor into the court's analysis, and I see that I'm out of time. So for the reasons I've said today and in our brief, we would ask that you affirm the district court's convictions and sentence. Thank you very much. Mr. Thurer, you've got some time over. Thank you, Your Honor. Judge Floyd, to address your issue on the conditions of supervised release, again, Hamilton makes clear that when you're dealing with a non-contact offense, which is what Mr. Arce has here, the massive deprivation of liberty reflected by a lifetime Internet ban is simply not supported. And Roblewski and Ellis, they're not really distinguishable because they came to you on a supervised release violation, but the underlying convictions that led to supervised release show that there, the conduct was much more contact as opposed to non-contact. So here, there was no particularized analysis by the district court as to why a lifetime ban on Internet use, a lifetime ban on contact with minors, a lifetime ban on pictures of nudity was constitutional or appropriate here. I do want to touch very quickly on . . . Since the district court didn't have the benefit of Ellis and Hamilton and some other cases, would we in this case simply send it back to the district court to have it take account of those cases and get another shot at it? I believe this court's decisions are clear that remand is the appropriate remedy if it finds that those conditions are not properly supported. I would like to point out something that my colleague brought up. You know, 701 lay opinion expert testimony cannot rely on hearsay. So Mr. Montoya can't testify as a lay opinion, to lay opinion, without being qualified as an expert by relying on GRIFI or anything else. And that's the same issue that we had with Detective Simpson, who would basically, through ostensibly as a lay opinion testimony, did a forensic video analysis to compare a thumbnail, a one-inch by one-inch image, to a video. Again, over objection to trial. And these evidentiary issues, when you're looking at the harmless error issue under Rule 52, they add up. You know, we had this improper lay opinion testimony. We have no evidence that any images on the Alcatel were viewed, because none of them had access dates. So for knowledge, it's entirely predicated on circumstantial evidence derived from the lay opinion of Simpson, derived from Montoya, the improper res geste evidence, in which you've got downloads a year prior from two IP addresses where the government admitted they had no idea who was on the other end of that IP address. They never recovered any images from those downloads on any of the devices Mr. Arce had. And they have no idea even what device was on the other side of that IP address at the time of those downloads. That is not res geste. That's like the gun and more, where the court said, you can't show the guy had a different gun to prove he had a second gun in this indictment. The counts that were charged were for specific files. And those files were not present in any of those downloads from two years prior that the court let in as res geste. All these things together, the inadmissible expert report, the improper lay opinion, the improper res geste, that is what the government concedes it relies upon to show knowledge. When it defends against the insufficiency of evidence argument in its brief on pages 42 and 43, it's relying upon this very evidence. Well, I believe that establishes the harmless error that I need to show. It is not highly probable the error did not affect the judgment when you take these various things together. The circumstantial case for knowledge when you have no access dates, and this is not, again, this court has cases where they have found circumstantial evidence like this to be sufficient when there was evidence of multiple devices with child pornography, a savvy collector, someone with 10 years of experience. Or a confession? Well, I'm back to my attack on the confession, Your Honor. Right? I'm presenting a package deal, and my package deal is that you have a coerced confession, you have improper evidentiary rulings that let you. They sort of all go together. I mean, I accept the sort of the chain's got to start from the confession. It's got to go to the search, and then that sort of bleeds into the evidentiary issues. But you sort of got to run the table. You don't have to admit that. I'll withdraw the question. I see that my time is over. Your Honor, I would simply ask the court to reverse the convictions in the sentence of Mr. Arce. Thank you very much. Thank you very much. I guess counsel is aware we have a longstanding tradition of coming down to shake hands with counsel, but we're interdicted from doing so still. So hopefully the next time that you return, we'll be able to come down and do that. So I want to thank both counsel for their arguments. Mr. Thurer, I see you're court-appointed, and we want to give special thanks to you because the court could not discharge its functions unless folks like you agreed to undertake these cases. So thank you all very much. We'll now move on to our last case.
judges: G. Steven Agee, Julius N. Richardson, Henry F. Floyd